THE PEOPLE v. HARRY MORRIS AND HARRY MORTON.

*Constitutional law—Horse-stealing—Information—Plea of guilty—Sentence.*

1. How. Stat. § 9180, providing a distinct punishment for horse-stealing, is constitutional, and does not supersede the general statute against larceny.

2. Where there are two counts in an information charging different grades of the same offense, upon a conviction or plea of guilty, it has been the general practice in England and in this country to pass judgment according to the count charging the highest grade of the offense.

3. It must be presumed, in support of a judgment upon a plea of guilty, that the respondent understood the information read to him, and that the judge, as required by law, correctly explained

the charge against him before passing sentence, and that he therefore pleaded guilty to *all* that the information contained.

Error to Kalamazoo. (Mills, J.) Argued May 1, 1890. Decided May 9, 1890.

Respondents were convicted of horse-stealing, and were sentenced to State prison for 7 years, and 6 years and nine months, respectively. The facts are stated in the opinion.

*D. G. F. Warner*, for respondents.

*B. W. Huston*, Attorney General, and *George P. Hopkins*, Prosecuting Attorney, for the people.

[The points of counsel are stated in the opinion, where the authorities are reviewed and discussed.—REPORTER.]

GRANT, J. The respondents were charged with the larceny of a horse of the value of $150. The information contained two counts,—one framed under the general statute for larceny; and the other charging the larceny under section 9180 of Howell's Statutes, which is an act to provide for the prevention and punishment of horse-stealing. The respondents, upon being arraigned, pleaded guilty. The court made the customary investigation for the purpose of determining whether their plea was made freely, with the full knowledge of the accusation against them, and without undue influence. The court, thereupon, sentenced Morton to the State prison for six years and nine months, and Morris for seven years.

Under the first count, respondents' sentence could not have been more than five years. Under the second count, their sentence could have been not less than three nor more than fifteen years, unless it was their first offense, in which case the court might have sentenced them to the State House of Correction for a term not exceeding

two years. It is contended that the sentence is erroneous for two reasons, viz.:

1. Because the plea of guilty applied only to the first count, under which the maximum penalty is five years.

2. Because section 9180, How. Stat., is unconstitutional, in that the punishment provided by it is "cruel or unusual."

1. The first contention cannot be maintained. Where there are two counts charging different grades of the same offense, under a conviction or plea of guilty, it has been the general practice in England and in this country to pass judgment according to the count charging the highest grade of the offense. In this case the offense was the same set up in both counts. It must be presumed that the respondents understood the information read to them, and that the judge, as required by law, correctly explained the charge against them before passing sentence. It must therefore be presumed that they pleaded guilty to all that the information contained. We find no authorities to the contrary. *Dean v. State*, 43 Ga. 218; *Adams v. State*, 52 Id. 565; *Estes v. State*, 55 Id. 131; *People v. Shotwell*, 27 Cal. 394; *State v. Tuller*, 34 Conn. 280; *Scott v. State*, 31 Miss. 473; *State v. Core*, 70 Mo. 491; *Com. v. Hope*, 22 Pick. 1; *Lyons v. People*, 68 Ill. 271; *Manly v. State*, 7 Md. 135; *Conkey v. People*, 1 Abb. Dec. 418.

*In re Franklin*, 77 Mich. 615, is not in point. In that case there were four counts, containing two distinct offenses, viz., larceny and the receiving of stolen goods. If convicted as a receiver, he could under our statute have avoided State prison by satisfaction. A proper regard for the rights of a citizen under such circumstances requires that the record should show of which crime the party is convicted. But the reason of that decision does not apply to cases where the law makes different grades

of the same offense, nor where by statute the same offense may receive different punishments; nor does the act providing for a distinct punishment for horse-stealing supersede the general statute for larceny. A respondent cannot be prejudiced by a proceeding under the first statute named, nor by counts embodying both statutes. We have statutes providing a different punishment for larceny from the person, from a dwelling-house, at a fire, etc. But it has never been contended that these superseded the general statute for larceny, nor that a person could not be convicted under this general statute, although the facts might warrant a prosecution under the others.

2. Article 6, § 31, of the Constitution of this State, provides that cruel or unusual punishment shall not be inflicted. It is to the credit of our country that its courts have seldom been called upon to determine whether legislative enactments infringe this clause of the Constitution. The question under this statute is for the first time directly before this Court. Indirectly this statute has been brought before the Court on former occasions, but the point has never been decided, though the opinions in those cases contain some expressions hostile to the policy of such legislation. With the policy of the law it is not our province to deal. That belongs to the Legislature, which is composed of representatives direct from the people, and who alone have the right to voice the sentiments of the people in the public enactments. When those sentiments are enacted into law, the only province of the Court is to determine their validity under the Constitution. The rule by which courts must be governed in such cases is as follows:

"When a statute is challenged as in conflict with the fundamental law, a clear and substantial conflict must be found to exist to justify its condemnation."

By this sound rule, and with but little light to be

gathered from the authorities, so few are they, we must approach the discussion and the determination of this question.

The difficulty in determining what is meant by "cruel and unusual punishments," as used in our Constitution, is apparent. Counsel for defendants claims that, as properly understood, it means, when used in this connection, punishment out of proportion to the offense. If by this is meant the degree of punishment, we do not think the contention correct. When, in England, concessions against cruel and unusual punishments were first wrested from the crown, slight offenses were visited with the most extreme punishment, and no protest was made against it. But our concern is to ascertain how this language is to be understood in the constitutional sense. *In re Bayard,* 25 Hun, 548, it is said:

"We first find the injunction against cruel and unusual punishment in the Declaration of Rights, presented by the convention to William and Mary before settling the crown upon them in 1688. That declaration recites the crimes and errors which had made the revolution necessary. These recitals consist of the acts only of the former king and the judges appointed by him, and one of them was that 'illegal and cruel punishment had been inflicted.' * * * The punishments complained of were the pillories, slittings, and mutilations which the corrupt judges of King James had inflicted without warrant of law, and the declaration was aimed at the acts of the executive; for the judges appointed by him, and removable at pleasure, were practically part of the executive. It clearly did not then refer to the degree of punishment, for the criminal law of England was at that time disgraced by the infliction of the very gravest punishment for slight offenses, even petit larceny then being punishable with death. But the declaration was intended to forbid the imposition of punishment of a kind not known to the law, or not warranted by the law."

Justice COOLEY says:

"Probably any punishment declared by statute for an

offense which was punishable in the same way at the common law could not be regarded as cruel or unusual, in the constitutional sense. And probably any new statutory offense may be punished to the extent and in the mode permitted by the common law for offenses of similar nature. But those degrading punishments, which in any state had become obsolete before its existing constitution was adopted, we think may well be held forbidden by it as cruel and unusual. We may well doubt the right to establish the whipping-post and the pillory in states where they were never recognized as instruments of punishment, or in states whose constitutions, revised since public opinion had banished them, have forbidden cruel and unusual punishments. In such states the public sentiment must be regarded as having condemned them as cruel, and any punishment which, if ever employed at all, has become altogether obsolete, must certainly be looked upon as unusual." Const. Lim. (4th ed.) 408.

But for the disposition of this case we may adopt the rule contended for, and then we must find (in order to declare the law unconstitutional) that the minimum punishment provided by the law is so disproportionate to the offense as to shook the moral sense of the people. Imprisonment for larceny is, and always has been, in this country and in all civilized countries, one of the methods of punishment. There may be circumstances surrounding the commission of larceny where fifteen years would not be considered too severe a punishment. When punishment is commensurate with the depravity of the criminal, as shown in the commission of the act, justice is done. Under most of our criminal laws, cases may arise where the punishment inflicted might be considered cruel, but that does not condemn the law. The judge in such case has acted within the jurisdiction of constitutional law, and other means must be resorted to to right the wrong. Appellate courts cannot interfere if the proceedings have been regular. The law itself must therefore be cruel or unusual to warrant the interposition of the courts.

It is argued that under this law a prisoner must be sentenced from three to fifteen years, while under other statutes, for the larceny of property of the same value, he could only be imprisoned for one year. This is not a fair or legitimate test. Our statutes, and so probably the statutes of all the states, recognize this distinction. Under our statutes larceny from the person, larceny from a dwelling-house, or at a fire, may be punished by imprisonment for five years. The cashier or any officer or servant of a bank, who takes any of the property intrusted to his care, and thereby commits larceny, may be imprisoned for ten years. Any officer, clerk, or person employed in the State treasury may, for larceny therefrom, be imprisoned for fourteen years. So, too, any person who shall, at the same term of court, be convicted of three distinct larcenies, may be imprisoned for fifteen years. In all these cases, the property stolen may not exceed the value of a dollar. It has never been contended that any of the punishments imposed by these statutes were cruel or unusual.

It is also argued that, under this statute, a man must be imprisoned for a longer period than may one who is convicted of manslaughter. The larceny of a horse usually, if not necessarily, implies a bad and wicked disposition. A person may be guilty of manslaughter without possessing any such disposition. He may be convicted of manslaughter when engaged in doing an act which is only *malum prohibitum,* and not *malum in se.* He may be found guilty of manslaughter under circumstances which do not have any tendency to show a wicked intent or purpose. I cannot, therefore, see that this law can be held unconstitutional, because the punishment inflicted must be greater than may be the punishment for manslaughter. This was expressly held in *Ex parte Mitchell,* 70 Cal. 1 (11 Pac. Rep. 488). *In re Bayard,* above cited,

the law provided a greater punishment for the same crime in the city than in the country, and it was held constitutional.

It will be conceded that the Legislature has the constitutional power to fix the minimum as well as the maximum of the punishment. It has also the exclusive jurisdiction to define "crime," and prescribe the punishment. It is supposed to represent the sentiment and wishes of the people. In these days of intelligence and improvement, extraordinary, indeed, must be the terms of a criminal law which would shock the average judgment of the people. The horse is an animal of peculiar value. His owner becomes attached to him because of his intelligence, and the use made of him. The thief makes him a means of escape by one of many roads. In a few hours he may perhaps drive him into another state. Organized bands of these thieves have existed in various parts of the country, and so extensive have been their depredations that vigilance committees have been organized to accomplish what the authorities seemed powerless to do. Under these circumstances, it seems to me clear that it would be almost a usurpation of authority for the courts to hold that a minimum punishment of three years, even, is so disproportionate to the offense as to be cruel or unusual. But for the first offense the person convicted may be sent to the House of Correction for any period not exceeding two years. Certainly here is discretion enough left to the trial court to protect the rights of any one. The policy of inflicting greater punishments for the second or more offenses has long been adopted, and is not questioned.

A few authorities may be referred to bearing upon the subject. In 1816 the legislature of New York passed an act to suppress dueling, the punishment being that the

80 MICH.—41.

convicted person should be incapable of holding or being elected to any post of profit, trust, or emolument, civil or military. The court held that the punishment did not come within the constitutional prohibition as cruel or unusual. *Barker v. People*, 3 Cow. 686.

A similar statute of the territory of New Mexico, for horse-stealing, imposed the punishment of not less than 30 nor less than 60 lashes on the bare back. Under the provisions organizing the territory, it was provided that the laws passed by the legislative assembly should be submitted to the Congress of the United States, and, if disapproved, should be null and of no effect. The act was submitted to Congress, and had never been disapproved. The law was held constitutional. *Garcia v. Territory*, 1 N. M. 415. See, also, *Ligan v. State*, 3 Heisk. 159.

This law was enacted in 1877, and no demand appears to have been made for its repeal or modification. We may therefore infer that it meets the approval of the people of this State, who, we are confident, would not permit a criminal law shocking to their moral sense, and imposing a cruel punishment, to remain long upon the statute-book. The crime of horse-stealing has generally been regarded from the earliest times as involving a greater degree of criminality than the larceny of other property. In England, by statute (Vol. 3, Eng. Statutes at Large, 1st Edw. 6, chapter 12, § 10, p. 497), in 1547 the horse-thief was deprived of the benefit of clergy, and this distinction was preserved in later statutes. 1 Steph. Crim. Law, 465–468. Statutes similar to our own have been enacted, and are still in force in many of the States. In Texas, this crime is punished by imprisonment for not less than five, nor more than fifteen, years; in Georgia, not less than four, nor more than twenty, years; in Arkansas, not less than five, nor more than fifteen, years; in Tenn-

essee, not less than three, nor more than ten, years; in Kentucky, not less than two, nor more than ten, years; in Maryland, not less than two, nor more than fourteen, years; in Wisconsin, not less than two, nor more than fifteen, years; in Virginia, not less than three, nor more than eighteen, years; in Illinois, not less than three, nor more than twenty, years; and in many other states the punishment is from one to ten years. We are not pointed to a single decision which condemns such statutes as unconstitutional.

Our conclusion, therefore, is that this statute cannot be condemned by the courts as imposing a cruel or unusual punishment, either in the popular or the constitutional sense. Conviction and sentence affirmed.

The other Justices concurred.